VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
MICHAEL J. VANOVERBEKE (P42641)
THOMAS C. MICHAUD (P46787)
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

Liaison Counsel for the Class

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

## SOUTHERN DIVISION

| | |
|---|---|
| DAVID N. ZIMMERMAN, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | Civ. No. 5:16-cv-14005-JCO-SDD Hon. John Corbett O'Meara |
| Plaintiff, ) ) | CLASS ACTION |
| vs. ) ) | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL |
| DIPLOMAT PHARMACY, INC., et al., ) ) | SECURITIES LAWS |
| Defendants. ) ) | DEMAND FOR JURY TRIAL |

1248219_1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................1

II.  JURISDICTION AND VENUE ......................................................19

III.  PARTIES ...........................................................................................20

IV.  DEFENDANTS KNOWINGLY, OR RECKLESSLY, MADE
      MATERIAL MISREPRESENTATIONS AND OMISSIONS
      DURING THE CLASS PERIOD .......................................................24

    A.  Defendants' Violations of GAAP Caused Diplomat's 1Q16 and
      2Q16 Financial Statements to Be Materially False and/or
      Misleading ........................................................................................33

        1.  Defendants Failed to Timely and Sufficiently Accrue and
          Account for Material DIR Fees in Violation of GAAP ...........33

        2.  GAAP Criteria Triggering Material Loss Contingencies
          and Disclosures ........................................................................42

    B.  Additional Scienter Allegations ..........................................................53

V.  LOSS CAUSATION/ECONOMIC LOSS ....................................59

    A.  CFO Whelan's Abrupt Resignation Partially Revealed that
      Diplomat Was Suffering Disappointing 3Q16 Financial Results
      from Dramatically Increased DIR Fees................................................60

    B.  Defendants Finally Reveal the Entirety of the Previously
      Concealed Truth that Its 3Q16 Results Were Negatively
      Impacted by Dramatically Increased DIR Fees ...................................62

VI.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE...................70

VII.  NO SAFE HARBOR ........................................................................72

VIII.  CLASS ACTION ALLEGATIONS ...............................................72

COUNT I.............................................................................................75

**Page**

For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against
All Defendants......................................................................................75

COUNT II ........................................................................................................76

For Violation of §20(a) of the Exchange Act  Against the Individual
Defendants........................................................................................76

PRAYER FOR RELIEF .....................................................................................77

JURY DEMAND .................................................................................................78

1248219_1

## I.    INTRODUCTION

1.    This is a class action brought against Diplomat Pharmacy, Inc. ("Diplomat" or the "Company"), its Chief Executive Officer ("CEO") and Chairman of its Board of Directors, Philip R. Hagerman ("Hagerman"), and its former Chief Financial Officer ("CFO"), Sean M. Whelan ("Whelan") (collectively, "Defendants") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").[1]

2.    Lead Plaintiffs David N. Zimmerman ("Zimmerman"), William Kitsonas ("Kitsonas") and the Government Employees' Retirement System of the Virgin Islands ("GERS") (collectively, "Plaintiffs") bring this action on behalf of a class of all purchasers of Diplomat common stock between February 29, 2016 and November 3, 2016, inclusive (the "Class Period"), to recover damages caused to the class by Defendants' violations of the federal securities laws.

3.    Diplomat is the country's largest independent specialty pharmacy.  The Company derives 99% of its revenue from the dispensing of specialty drugs, *i.e.*, medications intended for patients with complex diseases and rare genetic conditions,

---

[1]    Together, defendants Hagerman and Whelan are sometimes referred to herein as the "Individual Defendants."

such as hepatitis C and cancer.  Diplomat's specialty drugs cost thousands of dollars per prescription, some upwards of $30,000 to $40,000 and sometimes more.

4.      Medicare Part D ("Part D") is a voluntary outpatient prescription drug benefit for people on Medicare that went into effect in 2006.  All 57 million people on Medicare, including those ages 65 and older, and those under age 65 with permanent disabilities, have access to the Part D drug benefit through private plans ("Part D plan(s)" or "plan(s)") – offered by private companies ("Part D sponsor(s)" or "sponsor(s)") – approved by the federal government, *i.e.*, the Centers for Medicare & Medicaid Services ("CMS").  In 2016, nearly 41 million Medicare beneficiaries were enrolled in Part D plans ("Part D beneficiaries").

5.      Part D sponsors contract with pharmacy benefits managers ("PBMs") to administer the drug benefits of Part D plans.   PBMs, like CVS Caremark ("Caremark"), are companies that act as third-party administrators of prescription drug plans and are primarily tasked with developing and maintaining a drug formulary, contracting with pharmacies like Diplomat, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims.  These PBMs also contract with a network of providers, *i.e.*, pharmacies and medical practices that have integrated on-site or dispensing facilities to reimburse claims submitted by these participating pharmacy providers.

- 2 -

6.     Because of the sheer number of Part D beneficiaries and the fact that these individuals are financially incentivized to fill prescriptions with pharmacies in a plan's "preferred network," it is no surprise that pharmacies, including Diplomat, are eager to gain access to these networks and maintain their standing as a Part D preferred pharmacy.[2] As Diplomat CEO and Chairman Hagerman told an audience at a September 2016 healthcare conference, Part D "is a huge part of the specialty pharmacy space."[3]

7.     In 2015 and 2016, Diplomat dispensed the majority of its Part D prescriptions to individuals covered either by a plan offered by: (1) SilverScript Insurance Company, which is owned by CVS Health ("CVS")[4]; or (2) a sponsor who contracted to have Caremark serve as its PBM, *e.g.*, WellCare Health Plans, Inc. Therefore, a significant portion of Diplomat's Part D business flowed through its contract(s) with Caremark.

---

[2]   Federal regulations state that a preferred pharmacy must offer "covered Part D drugs at negotiated prices to Part D enrollees at lower levels of cost-sharing than apply at a non-preferred pharmacy under its pharmacy network contract with a Part D plan." 42 C.F.R. §423.100.

[3]   A November 3, 2016 Barclays Capital Inc. ("Barclays") analyst report estimated that around 35% of Diplomat's total revenue was from "serving Medicare Part D Plans."

[4]   CVS is the parent company of Caremark.

- 3 -

8.      Per its contract(s) with Diplomat, Caremark assessed Diplomat with direct and indirect remuneration fees ("DIR fees" or "fees").[5]  DIR fees, which PBMs are legally required to report to CMS annually, were originally conceived to reconcile certain rebates and other price concessions with the reimbursements paid by PBMs to pharmaceutical providers.  Over time, DIR fees came to include network participation fees, adjustments of the maximum allowable cost and the contracted reimbursement rates for medications, and reimbursements or fees for meeting or failing to meet certain quality metrics.  Some portion of DIR fees – particularly quality performance fees – are calculated and assessed after the point of sale.

9.      Prior to 2016, for every Diplomat Part D prescription that went through Caremark, Diplomat was retroactively assessed a flat-dollar DIR fee in an approximate $3 to $7 range.  However, because the ingredients in the specialty drugs dispensed by Diplomat could cost tens of thousands of dollars per prescription,

---

[5]  "DIR" was initially a term coined by CMS related to Part D to address price concessions (*e.g.*, drug manufacturer rebates) that would ultimately impact the gross prescription drug costs of Part D plans that were not captured at the point of sale, *i.e.*, at the time a pharmacy filled and/or dispensed the prescription.  Plans/PBMs are required to submit an annual "DIR" report to CMS, which is used by CMS in tandem with Prescription Drug Event data to "true up" what is paid to a Part D plan by CMS for a given plan year.

1248219_1

according to Hagerman, a $3 DIR fee was not an amount Defendants were "going to argue and fight about."

10.    But at the end of 2015, Caremark notified Diplomat, along with other retail and specialty pharmacies dispensing Part D prescriptions through the PBM, that starting January 1, 2016, Caremark was going to assess DIR fees between approximately 3% and 5% of a billed prescription's ingredient cost.  According to this DIR "fee schedule" (and an eight-page written update Diplomat received in early 2016), the fee percentage applied would be based on a pharmacy's satisfaction of certain performance metrics for a particular dispensed prescription.[6]

11.    Caremark, which, after the Class Period, Hagerman would refer to as the "outlying/outlier" PBM, was the only PBM that Diplomat contracted with that switched to this percentage-based range DIR fee assessment starting January 1, 2016.

---

[6]    Caremark contracted with a third-party aggregator who would review each Diplomat-related claim for a particular trimester (*e.g*., January through April 2016) and allot Diplomat a score based on its performance.  Approximately two months after the end of the trimester, Diplomat would receive a "scorecard" from Caremark, which would, *inter alia*, provide a total dollar amount for DIR fees assessed during that period.  The assessed DIR fees would then be deducted weekly from payments made by Caremark to Diplomat in following months.  For example, DIR fees assessed during the first trimester of 2016 would be deducted weekly from July through September 2016.

- 5 -

12.     Caremark notified Diplomat about this significant change before the start of 2016.   Indeed, CVS's CEO Larry Merlo told investors and analysts during a February 2017 conference call that, as far as pharmacies complaining about being assessed performance-based DIR fees, "network pharmacy providers are proactively informed of, and educated on, program details including their forecasted financial impact in ***advance of program implementation***."

13.     Internal, non-publicly available documents from other pharmacy groups, as early as November 2015, also demonstrate that pharmacies dispensing Part D prescriptions through Caremark, which included Diplomat as the country's largest independent specialty pharmacy, were well aware before the end of the Class Period that this PBM was going to assess DIR fees in an approximate 3% to 5% range.

14.     For example, a non-publicly available chart dated November 18, 2015 (*i.e.*, before the Class Period) from the pharmacy services organization PBAHealth, entitled "2016 Networks DIR," illustrates that pharmacies dispensing Part D prescriptions as part of Caremark's Preferred "Network 37" for the "SilverScript Plus" Plan – which Diplomat participated in for 2015 and 2016 – would be assessed DIR fees by Caremark ranging from "3.5% to 5.5%" of the paid cost of ingredients for brand and generic drugs.   Similarly, an internal chart of "2016 DIR Fees as of 3/1/2016" from the Pharmacy Providers of Oklahoma states that for "SilverScript and

- 6 -

Other Caremark Part D Plans," the DIR fee range is between "3% and 5.5%" of the ingredient cost paid.

15.     According to another PBA health document dated May 10, 2016, it "strongly encourag[ed] pharmacies to accrue 5% of each payment/remittance from CVS/Caremark Medicare Part D claim totals for the 2016 Medicare Part D plan year" because of this "3.5% to 5.5%" DIR fee assessment range.

16.     By the start of the Class Period in February 2016, Defendants were therefore aware that Caremark was assessing DIR fees in a range of 3%-5%, and they knew, or recklessly disregarded that the corresponding financial impact it would have on Diplomat's 2016 "bottom line."[7]  Instead of brushing off insignificant DIR fees as Defendants had done in prior years before Caremark changed DIR fees to the 3% to 5% range, by the beginning of 2016, Defendants faced the reality that these percentage-based DIR fees would be assessed on these same, expensive drug ingredients – ***resulting in "1,000% to 10,000%" increases in DIR fees*** – thereby wiping out close to half of the Company's gross margin on each of these expensive Part D prescriptions.

---

[7]     "Bottom line" refers to a company's net earnings, net income or earnings per share ("EPS").

17.    In 2016, Diplomat and CVS were also engaged in serious discussions about CVS potentially acquiring Diplomat.  These negotiations between Diplomat and CVS continued on through the summer and fall of 2016, when CVS walked away and ceased its pursuit of Diplomat as an acquisition target.

18.    Throughout the Class Period, Defendants had multiple incentives to keep news of Caremark's dramatic DIR fee change hidden from investors, and hence, Diplomat's stock price artificially inflated, via: (1) materially misleading statements and omissions in Diplomat's SEC Form 10-K for 2015 ("2015 10-K") and SEC Forms 10-Q ("10-Q") for the first and second quarters of 2016 ("1Q16" and "2Q16"); and (2) materially false and misleading 1Q16 and 2Q16 financial statements that publicly misrepresented Diplomat as a more profitable and financially successful company than it actually was.

19.    First, if CVS made an all-cash acquisition of Diplomat – like it did with Omnicare, Inc. in May 2015 – then anyone holding Diplomat shares at the time would receive a cash payout based on Diplomat's stock price and the amount of Company shares held.  According to certain Class Period SEC filings by Diplomat, Hagerman and his family owned over 38 million shares of Diplomat common stock, while Whelan owned just over 270,000 shares; thereby making an all-cash CVS acquisition of Diplomat a very lucrative proposition for the Company's top two executives.  An

all-cash purchase by CVS would also enable the Individual Defendants to liquidate their massive holdings without having to sell them on the open market and thereby avoid raising suspicions among investors and financial analysts. Indeed, neither Hagerman nor Whelan sold any shares of Diplomat common stock during the Class Period. In telling contrast, Hagerman sold $178 million worth of stock between October 2014 and December 2015, and Whelan sold nearly $6 million in August 2015.

20.    Second, depending on whether Diplomat met or exceeded certain 2016 "Adjusted EBITDA" (*i.e.*, earnings before interest, taxes, depreciation and amortization) and revenue targets: (1) Hagerman would receive an award of performance-based stock options; and (2) Whelan would be awarded incentive compensation in the form of both stock options and a cash bonus.[8] As explained in more detail below, by failing to properly accrue and account for the significant increase in Caremark-assessed DIR fees and reflect such accruals in Diplomat's

---

[8]    As Diplomat's 2015 Proxy Statement ("2015 Proxy") noted, the Company's Compensation Committee of the Board of Directors "***took significant direction from the recommendations of Mr. Hagerman*** given his role as Chief Executive Officer, Chairman of the Board and the controlling shareholder, with respect to the design and implementation of the Company's 2015 executive compensation program. Mr. Hagerman consulted with certain members of management prior to making such recommendations."

- 9 -

publicly filed 1Q16 and 2Q16 financial statements, the Company's Adjusted EBITDA was materially overstated during the Class Period. And, as the Individual Defendants would later publicly (and for the first time) reveal to investors and analysts when discussing the Company's 3Q16 financial results – "the DIR fees certainly while they hit revenue, ***they have a far, far greater effect on EBITDA***."

21.    So, on February 29, 2016, beginning with the filing of Diplomat's 2015 10-K, Defendants embarked on scheme to keep the Company's stock artificially inflated through a series of materially false and misleading statements and omissions that concealed both the existence of the dramatic change in how Caremark was assessing DIR fees in 2016, as well as how this significant change (*i.e.*, a 1,000% to 10,000% increase over 2015) would adversely and materially impact Diplomat's bottom line. Defendants' 2015 10-K (and subsequent 1Q16 and 2Q16 10-Qs) never even mentioned DIR fees and only misleadingly warned that: (1) "the continued efforts" of entities like PBMs "***may***" adversely impact Diplomat's profitability; and (2) Defendants "***expect***" pricing pressures from third-party payors. The hidden reality, however, was that by February 29, 2016, Defendants knew, or were reckless in not knowing, that the pricing pressures they had claimed to be "expecting," along with the adverse impact to the Company's profitability that "may" occur, had already materialized: Caremark-assessed DIR fees had skyrocketed 1,000% to 10,000%

- 10 -

compared to the immaterial flat-dollar $3 to $7 fees assessed by Caremark in prior years.

22.     Had Defendants properly and timely accrued the dramatically higher DIR fees that Caremark had notified them of prior to the Class Period, Diplomat's 1Q16 and 2016 publicly filed financial statements would have revealed (at least partially) that the Company's profitability was already being – as opposed to "may" – adversely impacted by one of its largest third-party payors, *i.e.*, Caremark.  Instead, Defendants violated Generally Accepted Accounting Principles ("GAAP")[9] by failing to adequately accrue the probable and estimable DIR fees that would be assessed for the first two quarters of 2016.

23.     Thus, Defendants' GAAP violations caused Diplomat's publicly filed financial statements to be materially misstated, including a material overstatement of GAAP EPS in the Company's income statements for 1Q16 and 2Q16.  Furthermore,

---

[9]     GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation SX (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

- 11 -

Defendants also knowingly, or at least recklessly, materially overstated Diplomat's 1Q16 and 2Q16 "Adjusted" EPS and Adjusted EBITDA – non-GAAP metrics widely reported and closely followed by investors and financial analysts – in the Company's Forms 8-K ("8-K") filed May 9, 2016 and August 9, 2016 for 1Q16 and 2Q16, respectively, for example.

24.    Additionally, Defendants' materially misleading omissions in Diplomat's 2015 10-K and 1Q16 and 2Q16 10-Qs also ran afoul of Item 303(a) of SEC Regulation S-K ("Item 303"), codified at 17 C.F.R. §229.303.[10]

25.    By the fall of 2016, with negotiations with CVS to acquire Diplomat virtually dead, Defendants received Diplomat's first trimester scorecard from Caremark stating the total amount of DIR fees it had been assessed – approximately 4.5% of each prescription's ingredients – which was within the 3% to 5% range

---

[10]    Item 303 helps to ensure that issuers provide investors with information that might reveal material problems, including adverse trends or changes in financial condition and results of operations. In effect, the Item 303 disclosures in Regulation S-K required Defendants to: (a) ensure that the information exists; (b) confirm it is accurate; (c) determine whether and how to disclose it, including ensuring sufficient disclosure; and (d) disclose the information. As alleged in more detail *infra*, Defendants' material omissions and failures to include adequate disclosures as required by Item 303 rendered Diplomat's 1Q16 and 2Q16 10-Qs materially false and misleading.

Caremark notified Defendants prior to 2016.[11]  And since the first week in July, Defendants were already seeing (and would continue to see through the end of September) the first trimester DIR fee deductions on a per-prescription level in the "835 Payment Remittance/Advice" forms Caremark sent Diplomat weekly.  At this point, Defendants were about two months away from having to report the Company's 3Q16 financial results, yet continued to conceal both the existence of Caremark's DIR fees as well as the materially adverse financial impact they had on the Company's profitability for 2016.

26.    On October 25, 2016, despite not specifically referencing DIR fees, Defendants, after the close of trading, made a partial disclosure of the financial turmoil the Company was facing as a result of the 3% to 5% increase – the source of which would be revealed less than ten days later – when Diplomat would publicly reveal that its 3Q16 financial results fell well short of expectations because of the increase in DIR fees.  Without making any comments as to the Company's upcoming 3Q16 earnings release, Defendants announced that Whelan, the only CFO Diplomat has ever had, was resigning.

---

[11]  As Hagerman told attendees of the Barclays Global Healthcare Conference in March 2017, "we were paying 4% to 5% DIR fees on every drug regardless whether they were in the categories they were testing."  The midpoint of this range is 4.5%.

- 13 -

27.   Industry analysts were both stunned by this announcement and worried for what this resignation really portended.  Calling Whelan's departure "sudden and surprising," analysts for Leerink Partners LLC ("Leerink") wrote on October 25, 2016 that:

> *In our view it is very unusual to announce the departure of a CFO one week ahead of reporting earnings.  Given the timing of this press report*, and our concerns about last quarter's results as well as specialty volumes, *we are more cautious on 3Q:16 earnings*.

28.   Analysts for Avondale Partners, LLC ("Avondale") echoed this sentiment when, the next day, they wrote that their "biggest concern" was that Diplomat "*did not comment on CY16 guidance in tandem with this significant announcement*." Further, Credit Suisse (USA) LLC ("Credit Suisse") analysts opined that Whelan's resignation bolstered their thesis that *Diplomat's "torrid growth is not remotely sustainable*."

29.   On October 26, 2016, the first day of trading following Defendants' after-hours partial disclosure, Diplomat's stock tumbled from $28.88 to $25.31 – a decline of more than 12%, on unusually high volume.

30.   Seven days later on November 2, 2016 and after trading had closed for the day, Defendants finally revealed the entirety of the previously concealed financial truth regarding the significant increase in DIR fees and the materially adverse impact

- 14 -

on Diplomat's growth.  Quoting its CEO and Chairman Hagerman, the Company issued a press release stating:

> *We are disappointed with our third quarter results, which were significantly impacted by the softness in the hepatitis C business nationwide, as well as by DIR fees.  The methodology and transparency around how PBMs are applying these DIR fees changed materially in 2016*, and while we cannot reverse the impact they had on this quarter, we are working with our partners in the specialty pharmacy industry and with legislators to achieve an amicable solution to this problem.

31.    As Whelan told investors and analysts during a conference call that same day, "***DIR fees dramatically impacted our profitability in the quarter***" and that the "fees affected revenue first but given they drop 100% to the bottom line, ***their impact is more acutely felt on our profits***."

32.    The Individual Defendants also took great pains to portray these DIR fees as an unforeseeable event that purportedly "caught the specialty pharmacy industry by surprise during the third quarter."  Yet Caremark specifically notified Diplomat and other specialty pharmacies prior to the start of the Class Period in February 2016 that DIR fees would range from 3% to 5% of the cost of a prescription's ingredients, and Diplomat knew how much it was charging for each of its prescription's ingredients. Thus, Diplomat knew the magnitude of the DIR fees within two percentage points. Nonetheless, merely because the exact amount of fees had not yet been assessed, the

- 15 -

Company's top two executives falsely claimed that their "potential magnitude" was unknowable until the arrival of the "first 2016 fee statements this quarter."

33.    In response to Defendants' after-hours disclosure about the material financial impact DIR fees had on Diplomat's 3Q16 results, the Company's stock plummeted more than 40% on November 3, 2016, from $22.38 to $12.95, on the heaviest volume of trading the Company's stock has ever had.

34.    Because Defendants had never even mentioned DIR fees during any previous 2016 SEC filing, conference call or press release, analysts were understandably stunned by this disclosure and the materially adverse impact the fees had on the Company's financial results.  Moreover, given that other publicly traded companies like Premier, Inc. ("Premier") and PharMerica Corp. ("PharMerica") (with specialty pharmacy businesses similar to Diplomat) had publicly stated that they adequately reserved for DIR fees throughout 2016, or that DIR fees were immaterial to their 3Q16 financial results, analysts were skeptical about Defendants' repeated claims that the entire specialty pharmacy industry was somehow blindsided by these fees.

35.    For example, following this announcement:

(a)    Avondale wrote that news of DIR fees impacting Diplomat "was certainly a surprise to us";

- 16 -

1248219_1

(b)    Analysts for Barclays, Leerink and Morgan Stanley, respectively, labeled these DIR fees "***material***," "***significant***," and "***new*** ***headwinds*** for Diplomat;

(c)    William Blair & Company LLC ("William Blair") analysts called Diplomat's 3Q16 results a "***sobering miss***," further noting that they were "surprised by the magnitude and speed of the deterioration in the company's business";

(d)    Credit Suisse called the DIR fees "an issue further obfuscat[ing] the pathway to sustainable economic profit generation" and that the DIR fee issue for Diplomat could very well be a "***monumental operating gaffe***" in light of the absence of "similar lamentations from other companies in our universe"; and

(e)    Leerink analysts also wrote that "[t]he sudden appearance of DIR fees for DPLO was ***most likely company specific*** and may have been a communication issue between the accounting department and the 'network management department'" and that, according to Caremark's parent company, CVS, "***[Diplomat] did not accrue properly for that they had to remit***" – a revelation that bolstered the analysts' belief that Defendants were "***mischaracterizing how DIR fees work, and 'is not telling the full story***.'"

36.    The allegations in this case are straightforward. Prior to the Class Period, Defendants knew, or at the very least should have known, that the DIR fees Diplomat was to be assessed in 2016 by Caremark, its largest PBM, were going to increase

- 17 -

anywhere from 1,000% to 10,000% over what they were in 2015. But instead of informing investors of this significant change and the materially adverse impact it had on Diplomat's financial health in 2016, Defendants concealed this information through false and/or misleading statements and omissions made in Diplomat's 2015 10-K and 10-Qs for 1Q16 and 2Q16.

37. Indeed, Defendants' fraud was explicitly confirmed in early 2017 when CVS (Caremark's parent company) told investors and analysts in early 2017 that not only did Caremark alert Diplomat of this drastic change in DIR fee assessment prior to 2016, but that throughout 1Q16 and 2Q16 "*[Diplomat] did not accrue properly for what they had to remit*." As Mark Merritt, President and CEO of the Pharmaceutical Care Management Association ("PCMA"), said in February 2017, the reason pharmacies like Diplomat "attack" DIR fees is that "they sign a contract to pay for it, and then they don't want to hold up their end of the bargain."

38. The following chronology illustrates Defendants' scheme to defraud investors:



## II.  JURISDICTION AND VENUE

39.    Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

40.    Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the false and misleading statements were made in or issued from this District.

- 19 -

### III.    PARTIES

41.    Lead Plaintiff Zimmerman is a pharmacist and investor living in Michigan.  During the Class Period, he purchased 1,100 shares of Diplomat common stock as set forth in the certification filed with this Court on January 9, 2017, and was damaged thereby.  Dkt. No. 11-3.

42.    Lead Plaintiff Kitsonas is a retiree and investor living in Michigan. During the Class Period, he purchased 30,450 shares of Diplomat common stock as set forth in the certification filed with this Court on January 9, 2017, and was damaged thereby.  *Id*.

43.    Lead Plaintiff GERS is a defined benefit pension plan for officials and employees of the Government of the Virgin Islands, and for their dependents and beneficiaries, for the payment of retirement annuities, disability annuities and other benefits.  Presently, GERS serves over 8,500 retirees and pensioners and over 9,000 active members.  GERS purchased 23,200 shares of Diplomat common stock as set forth in the certification filed with this Court on January 9, 2017 and was damaged thereby.  Dkt. No. 10-3.

44.    Defendant Diplomat is a Michigan corporation whose common stock is traded on the New York Stock Exchange ("NYSE") under the symbol DPLO. According to its public filings, Diplomat is the largest independent specialty pharmacy

- 20 -

in the United States and offers a broad range of innovative solutions to address the dispensing, delivery, dosing and reimbursement of clinically intensive, high-cost specialty drugs. Diplomat's core revenues are derived from the customized care management programs delivered to patients, including the dispensing of their specialty medications. Diplomat focuses on specialty drugs that are typically administered on a recurring basis to treat patients with complex chronic diseases that require specialized handling and administration as part of their distribution process. The Company's principal executive offices are located at 4100 S. Saginaw Street, Flint, Michigan 48507.

45.   Defendant Hagerman is Diplomat's CEO and Chairman, and has been since 1991. According to the Company's 2015 Proxy filed in April 2016, Hagerman is Diplomat's controlling shareholder and owned over 31% (or more than 20 million shares) of the Company's outstanding common stock. According to Diplomat's 2015 Proxy:

> *[Hagerman's] day-to-day leadership of the Company gives him critical insights into our operations*, strategy and competition, and he facilitates the Board's ability to perform its oversight function. Throughout his career at the Company, he has demonstrated strong entrepreneurial skills, as well as regulatory, marketing, strategic, and operational expertise. *Mr. Hagerman also possesses in-depth knowledge of, and key relationships in, the specialty pharmacy industry on a national basis*.

- 21 -

46.     Defendant Hagerman signed the false and misleading 2015 10-K, the false and misleading 2016 interim financial reports for 1Q16 and 2Q16, and the Sarbanes-Oxley Act of 2002 ("SOX") certifications that accompanied those financial reports.

47.     Defendant Whelan, a licensed and certified public accountant, served as Diplomat's first and only CFO from December 2010 until he tendered his resignation on October 25, 2016.[12]  According to a March 2016 *American Health Leader* article:

> Upon being hired at Diplomat, Whelan decided to spend his first week in operations in order to fully understand the role of employees, their greatest challenges, and, more broadly, to get a better feel for the company and the "specialty pharmacy" industry as a whole.

48.     Before his resignation, Diplomat's 2015 Proxy stated that:

> ***Whelan has demonstrated strong financial reporting, finance, accounting, strategic and operational expertise.  His day-to-day leadership of the Company gives him critical insights into our financial performance, operations and strategy***, and he will facilitate the Audit Committee's ability to perform its oversight function.  Further, his prior experience at both InfuSystem and Ford Motor Company ***provides him expertise with public company reporting responsibilities and complex corporate transactions, including mergers and acquisitions and capital market transactions***.

---

[12]   Whelan's resignation became effective as of December 31, 2016.  As part of the severance agreement, Whelan obtained a lump sum payment of $250,000.  The severance agreement contains a non-competition provision effective from December 31, 2016 until December 31, 2017.  His severance payment is curious to say the least, considering that in the Company's 2015 Proxy, Diplomat states that "[w]e do not provide severance benefits to any of our named executive officers."

- 22 -

49.    Whelan signed the false and misleading 2015 10-K, the false and misleading 2016 interim financial reports for 1Q16 and 2Q16, and the SOX certifications that accompanied those financial reports.

50.    During the Class Period, the Individual Defendants, as senior executive officers and directors of Diplomat, were in possession of and privy to confidential and proprietary information concerning Diplomat, its specialty pharmaceuticals, operations, finances, financial condition, and present and future business prospects for all of its specialty pharmaceuticals and business segments.  Because of their positions as Diplomat's senior-most executive officers, the Individual Defendants obtained, had access to and/or were in possession of material, adverse non-public information concerning Diplomat via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith.  As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

51.    As senior executive officers and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange

- 23 -

Act during the Class Period, and was actively traded on the NYSE and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Diplomat's operations, business and financial statements, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Diplomat securities would be based upon truthful and accurate information. Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## IV.    DEFENDANTS KNOWINGLY, OR RECKLESSLY, MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS DURING THE CLASS PERIOD

52.    On February 29, 2016, Diplomat filed its false and/or misleading 2015 10-K with the SEC.

53.    In the section titled "Risk Factors," the 2015 10-K purported to warn that:

- The continued efforts of health maintenance organizations, managed care organizations, PBMs, government programs (such as Medicare, Medicaid and other federal and state funded programs) and other third-party payors to limit pharmacy reimbursements *may* adversely impact our profitability; and

- We *expect* pricing pressures from third-party payors to continue given the high and increasing costs of specialty drugs.  Given the significant competition in the industry, we have limited bargaining power to counter payor demands for reduced reimbursement rates.

- 24 -

54.     Diplomat's 2015 10-K contained the following false and misleading SOX certifications, signed by Hagerman and Whelan:

1.     I have reviewed this Annual Report on Form 10-K of Diplomat Pharmacy, Inc. (the "Company") for the year ended December 31, 2015;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.     The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- 25 -

      c)     Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

      d)     Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter (the Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

     5.     The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

      a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

      b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

     55.     On May 9, 2016, Diplomat filed its false and/or misleading 1Q16 10-Q with the SEC. Under "Risk Factors," Diplomat's 1Q16 10-Q stated that "[t]here have been no material changes to the risk factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015, which was filed with the Securities and Exchange Commission on February 29, 2016."

- 26 -

56.     Diplomat's 1Q16 10-Q also contained the following false and misleading SOX certifications, signed by the Individual Defendants:

1.      I have reviewed this quarterly report on Form 10-Q of Diplomat Pharmacy, Inc. (the "Company") for the quarter ended March 31, 2016;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.      The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- 27 -

c)      Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter (the Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.      The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

57.      On August 9, 2016, Diplomat filed its false and/or misleading 2Q16 10-Q with the SEC.  Under "Risk Factors," Diplomat's 2Q16 10-Q stated that "[t]here have been no material changes to the risk factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015, which was filed with the Securities and Exchange Commission on February 29, 2016."

- 28 -

58.    Diplomat's 2Q16 10-Q contained SOX certifications nearly identical to the ones in its 1Q16 10-Q.  *See* ¶56, *supra*.

59.    The Management Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") sections of Diplomat's 2015 10-K and 10-Qs for 1Q16 and 2Q16 also omitted any reference to DIR fees and that Defendants were directly notified by Caremark that starting January 1, 2016, the assessment of DIR fees on a per-prescription basis materially changed.  Instead of assessing DIR fees using a flat-dollar amount, Caremark was going to assess them based on a range of approximately 3% to 5% of the cost on Diplomat's Part D prescription's ingredients. Because of this change and the price of Diplomat's Part D drugs, Defendants either knew or recklessly disregarded the fact that the total dollar amount of DIR fees assessed against Diplomat in 2016 would (and did) increase by 1,000% to 10,000% over 2015.

60.    The SEC has clearly articulated the importance of the MD&A section in communicating with the investing public in SEC Release Nos. 33-8350; 34-48960; FR-72, as follows:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and

- 29 -

interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.[13]

61.    The SEC has also clearly described the purpose of MD&A:

The purpose of MD&A is not complicated.  It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." [*See* Commission Statement About Management's Discussion and Analysis of Financial Condition and Results of Operations, Release No. 33-8056 (Jan. 22, 2002) [67 FR 3746] ("January 2002 Release").]  The MD&A requirements are intended to satisfy three principal objectives:

- to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.[14]

---

[13]    SEC's "Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations;" Release Nos. 33-8350; 34-48960; FR-72; December 29, 2003 ("2003 Release"); Part I.A.

[14]    *See* 17 CFR 229.303(a); 2003 Release; Part I.B. Item 303 applies to interim or quarterly reports, as well as fiscal year reports, when there are any material changes in financial conditions or the results of operations from the end of the preceding fiscal year to the date of the most recent interim financial statement.  "If interim period financial statements are included . . . a management's discussion and analysis of the financial condition and results of operations shall be provided so as to enable the reader to assess material changes in financial condition and results of operations between the periods . . . .  The discussion and analysis shall include a discussion of

- 30 -

62.    These statements in Diplomat's 2015 10-K and 10-Qs for 1Q16 and 2Q16, as set forth in ¶¶53-58, were materially false and/or misleading when made because Defendants knew or recklessly disregarded the fact that:

(a)    Caremark, the largest PBM through which Diplomat dispensed Part D prescriptions, notified Defendants before the Class Period that DIR fees assessed on the ingredients for each prescription changed from a flat-dollar amount of $3 to $7 to a percentage fee ranging between approximately 3% to 5% of each prescription's ingredients, depending on Diplomat's satisfaction of certain performance-based metrics.  Thus, the lowest percentage fee Diplomat would be assessed on each prescription's ingredients would be around 3% while the highest would be approximately 5%;

(b)    Because Diplomat's Part D specialty drug ingredients cost thousands of dollars, *i.e.*, sometimes upwards of $30,000, $40,000 or even more, this change in 2016 DIR fee assessments by Caremark would clearly result in fees that were 1,000% to 10,000% higher than what Diplomat was assessed in 2015; and

---

material changes in those items specifically listed in paragraph (a) of . . . Item [303], except that the impact of inflation and changing prices on operations for interim periods need not be addressed."  Item 303(b).

- 31 -

(c)      Caremark's significant DIR fee assessment change that Diplomat was notified of before 2016 adversely and materially impacted some of the Company's core financial metrics, such as EBITDA, GAAP EPS, and non-GAAP Adjusted EPS for 1Q16, 2Q16 and 2016 as a whole.

63.      The material information Defendants omitted as set forth in ¶62 also made Diplomat's 2015 10-K and 10-Qs for 1Q16 and 2Q16 materially false and/or misleading because, in violation of Item 303, Defendants knowingly failed to make the necessary disclosures regarding the following:

(a)      Diplomat's "financial condition, changes in financial condition and the results of operations";

(b)      "[K]nown trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in [Diplomat's] liquidity increasing or decreasing in any material way";

(c)      "[U]nusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations";

(d)      "[S]ignificant components of revenues or expenses that, in the [Diplomat's] judgment, should be described in order to understand [Diplomat's] results of operations"; and

- 32 -

(e)    "[K]nown trends or uncertainties that have had or that [Diplomat]

reasonably expects will have a material favorable or unfavorable impact on net sales

or revenues or income from continuing operations."

## A. Defendants' Violations of GAAP Caused Diplomat's 1Q16 and 2Q16 Financial Statements to Be Materially False and/or Misleading

### 1. Defendants Failed to Timely and Sufficiently Accrue and Account for Material DIR Fees in Violation of GAAP

64.    In violation of GAAP, Defendants knowingly, or at the very least

recklessly, failed to timely record sufficient accruals for DIR fees for 1Q16 and 2Q16

as required by Accounting Standards Codification ("ASC") 450, Contingencies ("ASC

450").  Defendants thereby materially overstated GAAP EPS in Diplomat's income

statements in Diplomat's 8-Ks announcing its financial results for 1Q16 and 2Q16 and

in the 10-Qs for those quarters.

65.    Defendants also knowingly, or recklessly, materially overstated

Diplomat's "Adjusted EPS" figures for 1Q16 and 2Q16.  Adjusted EPS is a non-

GAAP metric widely reported and closely followed by investors and financial analysts

that was falsely reported in the Company's 8-Ks filed on May 9, 2016 and August 9,

- 33 -

2016.[15]   The Wall Street consensus estimates of financial analysts, for example,

commonly use the Company's non-GAAP Adjusted EPS to forecast results and

performance.[16]

66.    The Defendants also knowingly, or recklessly, materially overstated

Diplomat's Adjusted EBITDA measures for 1Q16 and 2Q16.[17]   Adjusted EBITDA is

another non-GAAP metric widely reported and closely followed by investors and

---

[15]   According to the Company, "Adjusted EPS adds back, net of income taxes, the impact of all merger and acquisition related expenses, including amortization of intangible assets, the change in fair value of contingent consideration related to our acquisitions, as well as transaction-related costs."  Adjusted EPS also:

> exclude[s] merger and acquisition-related expenses . . . because [the Company] believe[s] the amount of such expenses in any specific period may not directly correlate to the underlying performance of [its] business operations and such expenses can vary significantly between periods as a result of new acquisitions, full amortization of previously acquired intangible assets or ultimate realization of contingent consideration.

The Company reconciles the non-GAAP Adjusted EPS to GAAP EPS in the exhibits attached to the Company's 8-Ks for 1Q16 and 2Q16.

[16]   For example, under the Thompson Reuters I/B/E/S (Institutional Brokers Estimates System), the Wall Street estimates for non-GAAP Adjusted EPS (diluted basis) were $0.18 for 1Q16, $0.21 for 2Q16, and $0.24 for 3Q16.

[17]   The Company "define[s] Adjusted EBITDA as net income (loss) before interest expense, income taxes, depreciation and amortization, share-based compensation, restructuring and impairment charges, equity loss and impairment of non-consolidated entities, and certain other items that [it does] not consider indicative of [] ongoing operating performance []."  8-K filed February 29, 2016, Addendum.

- 34 -

financial analysts that was falsely reported in the Company's 8-Ks filed on May 9, 2016 and August 9, 2016. Wall Street consensus estimates of the Company's non-GAAP Adjusted EBITDA were also widely available and discussed as a measure of forecasting the Company's results and performance.

67.    All of Defendants' violations of ASC 450 (and Item 303) stem from their knowing, or reckless, failure to timely record sufficient accruals for DIR fees for 1Q16 and 2Q16. Defendants knew, or recklessly disregarded, that their DIR fee estimates in each quarter were an offset (or contra account) to revenues or net sales, and reduced the amount of revenues in each corresponding quarter. In its SEC Form 10-K for 2016 ("2016 10-K"), Diplomat stated that "[t]he Company accrues an estimate of fees, including direct and indirect remuneration fees ('DIR fees'), which are assessed or expected to be assessed by payors [such as pharmacy benefit managers or PBMs] at some point after adjudication of a claim, as a reduction at the time revenue is recognized." Further, "[c]hanges in the Company's estimate of such fees are recorded when the change becomes known." Thus, Defendants knew, or were reckless in not knowing, that the adverse impact of the DIR fee estimates on revenues flowed through to the Company's bottom line, adversely and materially affecting gross profits, gross margins, net income, Adjusted EBITDA, GAAP EPS, Adjusted EPS and revenues.

- 35 -

68.    Nevertheless, Defendants knowingly, or recklessly, failed to accrue sufficient estimates of DIR fees for 1Q16 and 2Q16, thereby materially overstating GAAP EPS and Adjusted EPS for those corresponding quarters during the Class Period.  For 1Q16 and 2Q16, Defendants accrued only approximately $600,000 and $1 million, respectively, well short of what Defendants should have accrued for those respective quarters had they complied with ASC 450.  As Defendants would later publicly acknowledge in Diplomat's 3Q16 disclosures, the DIR fees attributable to revenues earned should have been: (a) $1.7 million more than the $600,000 originally accrued, or $2.3 million total for 1Q16; and (b) $2.3 million more than the $1 million originally accrued, or $3.3 million total for 2Q16.

69.    If Defendants had timely and properly accrued the $2.3 million and $3.3 million of DIR fees for 1Q16 and 2Q16, respectively, then Diplomat's "catch-up" DIR fee charge would only have been $4.5 million in 3Q16 instead of the $8.5 million charge that the Company actually recorded (*i.e.*, $8.5 million actual catch-up DIR fee charge, less $1.7 million DIR fees that should have been accrued for 1Q16, less $2.3 million DIR fees that should have been accrued for 2Q16, equals $4.5 million normalized DIR fees for 3Q16).

70.    Although Defendants have stated that "DIR fees have a minor impact on revenues," the adverse impacts of the understated DIR fees on the 1Q16 and 2Q16

- 36 -

financial statements were still material because Defendants also acknowledge that "all [DIR fees] drop to the bottom line."[18] Consequently, the adverse impacts attributable to the under-accrued DIR fees on GAAP EPS and non-GAAP Adjusted EPS were material for those quarters, as noted below.

71.    Under GAAP requirements, had Defendants taken appropriate accruals of $2.3 million for 1Q16, $3.3 million for 2Q16, and $4.5 million for 3Q16, the corrected EPS would have been $0.21, $0.10, and $0.09 per diluted share for 1Q16, 2Q16, and 3Q16, respectively, instead of $0.23, $0.13, and $0.08 per diluted share as reported. These GAAP EPS overstatements as reported were clearly material compared to the corrected EPS amounts, with GAAP EPS overstatements of 10% and 30% for 1Q16 and 2Q16, respectively, and a GAAP EPS understatement of 14% for 3Q16.

72.    Reported EPS overstatements of 5% or more would be deemed material by investors based on SEC guidance.  "The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is

---

[18]  3Q16 Earnings Call Supplemental Slides, at 4.

unlikely to be material."[19]  Thus, the magnitude of Defendants' misstatements equaled or exceeded the 5% threshold commonly used as a rule of thumb by registrants and auditors in materiality assessments.

73.    Misstatements less than 5%, however, may also be deemed material based on qualitative factors.  "Evaluation of materiality requires a registrant and its auditor to consider *all* the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material."[20]  "Among the considerations that may well render material a quantitatively small misstatement of a financial statement item [is] . . . whether the misstatement masks a change in earnings or other trends."  This qualitative factor clearly applies here, as Defendants' failure to properly accrue adequate DIR fees in 1Q 2016 and 2Q 2016 masked a trend of declining profit margins and earnings due to dramatically increasing DIR fees that were being assessed by Caremark.[21]

74.    Additionally, the Company's bottom-line GAAP EPS and non-GAAP adjusted EPS were among the most widely reported metrics on the Company's

---

[19]   SEC Staff Accounting Bulletin No. 99 – Materiality.

[20]   *Id*. (emphasis in original).

[21]   *Id*.

financial statements and were among the most closely tracked metrics by investors and financial analysts.

75.    The following chart illustrates Diplomat's corrected income statements on a GAAP basis for 1Q16, 2Q16, and 3Q16, including corrections for the appropriate under (over) accrued DIR fees that applied under ASC 450 in each of these respective quarters.   The financial impact of the under-accrued DIR fees was to materially overstate GAAP EPS by 10% in 1Q16 and 30% in 2Q16.

- 39 -

**Diplomat Pharmacy**
**GAAP BASIS**
Income Statements Corrected for Under (Over) Accrued DIR Fees
(in thousands except per share amounts and percentages)

| | 1Q16 | 2Q16 | 3Q16 |
|---|---|---|---|
| Income Before Taxes As Reported | $23,717 [1] | $12,438 [2] | ($408) [3] |
| Corrected DIR Fee Accruals: | | | |
|     Normalized Accruals | 2,300 [4] | 3,300 [4] | 4,500 [4] |
|     Less Actual Accruals Taken | 600 [5] | 1,000 [5] | 8,500 [5] |
|     Amount Under (Over) Accrued | 1,700 [5] | 2,300 [5] | (4,000) [5] |
| Corrected Pretax Income | $22,017 | $10,138 | $3,592 |
| | | | |
| Corrected Pretax Income | $22,017 | $10,138 | $3,592 |
| Estimated Income Tax Expense | (7,922) | (3,379) | 285 |
| Corrected Net Income | 14,095 | 6,759 | 3,877 |
| Less net loss attributable to noncontrolling interest | (246) [1] | (241) [2] | (2,580) [3] |
| Corrected GAAP Net income attributable to Diplomat Pharmacy | $14,341 | $7,000 | $6,457 |
| Corrected GAAP Net Income Per Share | | | |
|     Basic | $0.22 | $0.11 | $0.10 |
|     Diluted | $0.21 | $0.10 | $0.09 |
| | | | |
| Basic shares | 64,539 [1] | 66,085 [2] | 66,511 [3] |
| Diluted shares | 67,845 [1] | 68,034 [2] | 68,360 [3] |
| | | | |
| Reported GAAP net income attributable to Diplomat Pharmacy per diluted share. | $0.23 [1] | $0.13 [2] | $0.08 [3] |
| Corrected GAAP net income attributable to Diplomat Pharmacy per diluted share with DIR fee accrual. | $0.21 | $0.10 | $0.09 |
| Percentage under accrued based on corrected GAAP net income per diluted share with DIR fee accrual. | 10% | 30% | (14%) |

[1]Diplomat 1Q16 10-Q p. 4.
[2]Diplomat 2Q16 10-Q p. 4.
[3]Diplomat 3Q16 10-Q p. 4.
[4]Normalized accrual is equal to actual DIR fee accrual taken plus the amount under (over) accrued.
[5]Diplomat 3Q16 Earnings Call Supplemental Slides, November 2, 2016 pp. 4.

76.    The following chart shows Diplomat's corrected income statements on a non-GAAP adjusted basis for 1Q16 and 2Q16, including corrections for the appropriate under (over) accrued DIR fees that applied under ASC 450 in each of

- 40 -

these respective quarters, since investors and financial analysts also closely tracked non-GAAP Adjusted EPS results. The financial impact of the under-accrued DIR fees was to materially overstate non-GAAP Adjusted EPS by 10% in 1Q16 and 10% in 2Q16.

**Diplomat Pharmacy, Inc.**
**NON-GAAP BASIS**
EPS Corrected for DIR Fees Accrued
(in thousands except percentages and earnings per share)

|  | 1Q16 | 2Q16 |
|---|---|---|
| Income/Loss before income taxes | $23,717 [1] | $12,438 [2] |
| Under (over) accrued DIR Fees | (1,700) [3] | (2,300) [3] |
| Corrected Adjusted Income before taxes | 22,017 | 10,138 |
| Estimated Income Tax Expense | 7,922 | 3,379 |
| Corrected Adjusted Net Income | 14,095 | 6,759 |
| Less: net loss attributable to noncontrolling interests | (246) [1] | (241) [2] |
| Corrected Net Income attributable to Diplomat Pharmacy | $14,341 | $7,000 |
| Adjustments: |  |  |
| Amortization of acquisition-related intangible assets | $8,684 [4] | $9,818 [5] |
| Contingent consideration and other merger and acquisition expenses | (8,429) [4] | 1,103 [5] |
| Income tax impact of adjustments | (92) [4] | (3,639) [5] |
| Corrected Adjusted Non-GAAP net income | $14,504 | $14,282 |
| Corrected Adjusted Non-GAAP EPS with accrual for DIR fees | $0.21 | $0.21 |
| Diluted shares outstanding | 67,845 [1] | 68,034 [2] |
| Reported Adjusted Non-GAAP EPS with accrual for DIR fees | $0.23 [4] | $0.23 [5] |
| Corrected Adjusted Non-GAAP EPS with accrual for DIR fees | $0.21 | $0.21 |
| Percentage under accrued based on corrected non-GAAP net income per diluted share with accrual for DIR fees | 10% | 10% |

[1]Diplomat 1Q16 10-Q p. 4
[2]Diplomat 2Q16 10-Q p. 4
[3]Diplomat 3Q16 Earnings Call Supplemental Slides, November 2, 2016 p. 4
[4]1Q16 8-K Addendum filed May 9, 2016
[5]2Q16 8-K Addendum filed Aug 9, 2016

- 41 -

### 2. GAAP Criteria Triggering Material Loss Contingencies and Disclosures

77. All of Defendants' violations of ASC 450 stem from their knowing, or reckless, failure to record adequate accruals for DIR fees for 1Q16 and 2Q16. Defendants knew, or recklessly disregarded, that their DIR fee estimates in each quarter were an offset (or contra account) to revenues or net sales, which reduced the amount of revenues in each corresponding quarter on the Company's income statement.

78. Defendants also knew, or were reckless in not knowing, that their DIR fee estimates in each quarter created the simultaneous need for a corresponding current liability to be recognized in each respective quarter on the Company's balance sheet equal to the amount of revenues offset by those DIR fee estimates. This was the case because as Defendants knew, or were reckless in not knowing, 2016 DIR fees would have to be remitted to – or "clawed back" by – the payor (or PBM) between July 2016 and May 2017.

79. ASC 450 required Defendants to ensure that the DIR fees were properly and timely accrued for 1Q16 and 2Q16, in this case as a reduction to revenues and an

- 42 -

increase in current liabilities, to recognize the loss contingency when the amount of the loss or future payment was probable and reasonably estimable.[22]

80.    Pursuant to GAAP:

An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:

a. Information available before the financial statements are issued or are available to be issued . . . indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  Date of the financial statements means the end of the most recent accounting period for which financial statements are being presented.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss[; and]

b. The amount of loss can be reasonably estimated.  The purpose of those conditions is to require accrual of losses when they are reasonably estimable and relate to the current or a prior period.[23]

---

[22]    Under GAAP, "probable" means "[t]he future event or events are likely to occur." ASC 450-20-20, Glossary.  GAAP uses the broad term "loss contingency" to refer to such future charges as DIR fees.  GAAP defines loss contingency as:

An existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur.  The term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses.

*Id.*

[23]    ASC 450-20-25-2.

- 43 -

81.    Additionally, GAAP states that:

[i]f some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued.  When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued.  Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount.[24]

82.    Importantly, GAAP cautions issuers that "[d]isclosure of the nature of an accrual made pursuant to the provisions of paragraph 450-20-25-2, and in some circumstances the amount accrued, may be necessary for the financial statements not to be misleading.  Terminology used shall be descriptive of the nature of the accrual, such as estimated liability or liability of an estimated amount."[25]

83.    Although Defendants recognized that DIR fees needed to be timely accrued, Defendants chose to only accrue approximately $600,000 and $1 million for 1Q16 and 2Q16, respectively, well short of the $2.3 million and $3.3 million that Defendants should have accrued for those respective quarters, had Defendants complied with ASC 450.  Defendants knew, or recklessly disregarded, that their contract(s) with Caremark provided DIR fee assessments of 3% to 5% of the paid ingredient cost, with an average DIR fee of approximately 4.5% of ingredient costs.

---

[24]    ASC 450-20-30-1.

[25]    ASC 450-20-50-1.

Defendants also knew, or recklessly disregarded, that their volume of prescription business with Caremark dramatically increased throughout fiscal year 2016 and, consequently, that DIR fees would increase proportionately with the Company's increased volume of prescription business with Caremark during 1Q16 and 2Q16.

84.     Therefore, given the Company's contractual requirements with Caremark, Defendants knew, or recklessly disregarded, that GAAP required them to book accruals of DIR fees equal to the best estimate within the 3% to 5% range, which was approximately 4.5% of ingredient costs at the time Diplomat filled and/or dispensed each prescription throughout Caremark. "If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued."[26]   The charts in ¶¶75-76 show the material overstatements of GAAP EPS and non-GAAP Adjusted EPS, respectively, based on the reasonable accrual of DIR fees in the amount of 4.5% of ingredient costs at the time Diplomat filled and/or dispensed the prescription.

85.     However, even if Defendants had determined that no individual amount within the 3% to 5% range of ingredient costs with Caremark claims for the accrual of DIR fees could be deemed probable, GAAP still required Defendants to book the

---

[26]  ASC 450-20-30-1.

- 45 -

accrued DIR fees at a minimum of 3%, the low end of the expected 3% to 5% range for DIR fees with Caremark. "When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount."[27]

86.    On March 7, 2017, Hagerman publicly stated that the "outlying PBM Caremark moved their fees in the 3% to 5% [range], to 5.5% [a figure outside the originally expected range]." He explained:

> DIR fees really stand for access and network fees that PBMs have put in place. They are not a new phenomenon but last year, one PBM outlier [Caremark] changed their model around a little bit and in the past, DIR fees have been, again, network asset fees of $3 to $5, to $7. We had an individual outlying PBM that moved their fees in the 3% to 5%, to 5.5%. Now, we're talking about very high cost specialty drugs of $5,000, to $10,000, to $15,000. So that DIR change for that particular outlier is between 1,000% and 10,000% participant higher than the marketplace.

87.    Consequently, Plaintiffs have modified the previous two charts at ¶¶75-76, showing the corrected GAAP EPS and non-GAAP Adjusted EPS, to assume that the Company's own "normalized" DIR fees were based on the higher, unexpected 5.5% rate of ingredient costs, rather than the average 4.5% rate applied in the previous

---

[27]  ASC 450-20-30-1.

two charts, to determine the ingredient cost amounts for each quarter.[28]  Plaintiffs then determined the appropriate DIR fee accruals by multiplying the low end 3% rate by the corresponding ingredient costs for each quarter, which gives Defendants the most favorable analysis under GAAP.

88.    Nonetheless, even if Defendants had booked DIR fee accruals at the low end of the 3% to 5% range of ingredient costs at the time Diplomat filled and/or dispensed the prescription during the Class Period (minimizing DIR fees), Defendants would still have materially overstated reported GAAP EPS by 5% in 1Q16 and by 8% in 2Q16.  Therefore, there are no reasonable set of facts or circumstances permissible under ASC 450 whereby Defendants can claim that they did not knowingly overstate revenues and materially inflate GAAP EPS during the Class Period, as shown in the chart below.

---

[28]  For example, to determine the lowest reasonable ingredient costs in 1Q16, Plaintiffs divided Defendants' own normalized 1Q16 accrual by 5.5%, the highest reasonable DIR fee rate (*i.e.*, $2.3 million normalized 1Q16 DIR fee accrual divided by 5.5% DIR fee rate equals $41.818 million estimated ingredient costs).  And to determine the lowest reasonable ingredient costs in 2Q16, Plaintiffs divided Defendants' own normalized 2Q16 accrual by 5.5%, the highest reasonable DIR fee rate (*i.e.*, $3.3 million normalized 2Q16 DIR fee accrual divided by 5.5% DIR fee rate equals $60 million estimated ingredient costs).

- 47 -

**Diplomat Pharmacy**
**GAAP BASIS**
DIR Fees: Estimating Dollar Amount Under (Over) Accrued
Assumes DIR Fees of 5.5% of Ingredient Costs and 3% DIR Fee Accruals
(in thousands except per share amounts)

| | 1Q16 | 2Q16 | 3Q16 |
|---|---|---|---|
| Pretax Income As Reported | $23,717 [1] | $12,438 [2] | ($408) [3] |
| | | | |
| Normalized Accruals | 2,300 [4] | 3,300 [4] | 4,500 [4] |
| Estimated Ingredient Costs (assuming 5.5% DIR fees) | 41,818 [5] | 60,000 [5] | 104,651 [5] |
| Low-End, 3% DIR Fee Accrual (based on 3%-5%) Range | 1,255 [6] | 1,800 [6] | 3,140 [6] |
| Actual Accruals Taken | ($600) [4] | ($1,000) [4] | ($8,500) [4] |
| Amount Under (Over) Acrued | $655 | $800 | (5,360) |
| | | | |
| Corrected Pretax Income | $23,062 | $11,638 | $4,952 |
| Estimated Income Tax Expense | (8,298) | (3,878) | 393 |
| Corrected Net Income | 14,764 | 7,760 | 5,345 |
| Less net loss attributable to noncontrolling interest | (246) [1] | (241) [2] | (2,580) [3] |
| Estimated Net income attributable to Diplomat Pharmacy | $15,010 | $8,001 | $7,925 |
| | | | |
| Corrected GAAP EPS with 3% DIR fee accrual | $0.22 | $0.12 | $0.12 |
| | | | |
| Diluted shares outstanding | 67,845 [1] | 68,034 [2] | 68,360 [3] |
| | | | |
| Reported GAAP net income per diluted share. | $0.23 [1] | $0.13 [2] | $0.08 [3] |
| Corrected GAAP diluted EPS with 3% DIR fee accrual. | $0.22 | $0.12 | $0.12 |
| Percentage under accrued based on corrected GAAP net income per diluted share with 3% DIR fee accrual. | 5% | 8% | (33%) |

[1]Diplomat 1Q16 10-Q  p. 4
[2]Diplomat 2Q16 10-Q p. 4
[3]Diplomat 3Q16 10-Q  p. 4
[4]Diplomat 3Q16 Earnings Call Supplemental Slides,
  November 2, 2016 pp. 4
[5]Estimated ingredient costs calculated by dividing corrected
  accruals by 5.5% DIR fees. Conference Call March 7, 2017 p. 5
[6]DIR fee accrual is equal to 3% DIR fee low-end percentage
  multiplied by ingredient costs.

89.    Similarly, assuming that it would have been proper under GAAP for

Diplomat to book DIR fee accruals at the low end of the 3% to 5% range of ingredient

costs at the time they filled and/or dispensed the prescription during the Class Period,

there is still no reasonable set of facts or circumstances permissible whereby

- 48 -

Defendants can claim that they did not knowingly overstate revenues and materially inflate non-GAAP EPS during the Class Period, as shown in the chart below.  Even applying these assumptions that give Defendants the most favorable analysis, the financial impact of the under-accrued DIR fees was to materially overstate non-GAAP Adjusted EPS by 5% in 1Q16 and 5% in 2Q16.

**Diplomat Pharmacy**
**NON-GAAP BASIS**
DIR Fees: Estimating Dollar Amount Under (Over) Accrued
Assumes DIR Fees of 5.5% of Ingredient Costs and 3% DIR Fee Accruals
(in thousands except per share amounts)

| | 1Q16 | 2Q16 |
|---|---|---|
| Pretax Income As Reported | $23,717 [1] | $12,438 [2] |
| | | |
| Normalized Accruals | 2,300 [3] | 3,300 [3] |
| Estimated Ingredient Costs (assuming 5.5% DIR fees) | 41,818 [4] | 60,000 [4] |
| Low-End, 3% DIR Fee Accrual (based on 3%-5%) Range | 1,255 [5] | 1,800 [5] |
| Actual Accruals Taken | ($600) [3] | ($1,000) [3] |
| Amount Under (Over) Acrued | $655 | $800 |
| | | |
| Corrected Pretax Income | $23,062 | $11,638 |
| Estimated Income Tax Expense | (8,298) | (3,878) |
| Corrected Net Income | 14,764 | 7,760 |
| Less net loss attributable to noncontrolling interest | (246) [1] | (241) [2] |
| Estimated Net income attributable to Diplomat Pharmacy | $15,010 | $8,001 |
| Adjustments: | | |
| Amortization of acquisition-related intangible assets | $8,684 [6] | $9,818 [7] |
| Contingent consideration and other merger and acquisition expense | (8,429) [6] | 1,103 [7] |
| Income tax impact of adjustments | (92) [6] | (3,639) [7] |
| Corrected Adjusted non-GAAP net income corrected for appropriate DIR fee accrual | $15,173 | $15,283 |
| | | |
| Corrected Adjusted non-GAAP EPS with 3% DIR fee accrual | $0.22 | $0.22 |
| | | |
| Diluted shares outstanding | 67,845 [1] | 68,034 [2] |
| | | |
| Reported Adjusted non-GAAP net income per diluted share. | $0.23 [6] | $0.23 [7] |
| Corrected Adjusted non-GAAP diluted EPS with 3% DIR fee accrual. | $0.22 | $0.22 |
| Percentage under accrued based on corrected adjusted non-GAAP net income per diluted share with 3% DIR fee accrual. | 5% | 5% |

[1] Diplomat 1Q16 10-Q p. 4
[2] Diplomat 2Q16 10-Q p. 4
[3] Diplomat 3Q16 Earnings Call Supplemental Slides, November 2, 2016 pp. 4
[4] Estimated ingredient costs calculated by dividing corrected accurals by 5.5% DIR fees. Conference Call March 7, 2017 p. 5
[5] DIR fee accrual is equal to 3% DIR fee low-end percentage multiplied by ingredient costs.
[6] 1Q16 8-K Addendum filed May 9, 2016
[7] 2Q16 8-K Addendum filed Aug 9, 2016

- 50 -

90.    Adjusted EBITDA was another of the Company's most important measures of performance.  Indeed, Defendants' guidance to investors consisted of Defendants' estimates of expected Adjusted EBITDA, as well as estimates of expected revenue and Adjusted EPS.[29]  Financial analysts also regularly referred to actual and expected Adjusted EBITDA, along with Adjusted EPS, as measures of the Company's performance.  As Cowen and Company noted in their report for 3Q16, issued November 3, 2016, "Adj. EBITDA of $22.6M also missed consensus of $33.3M [and] Adj. EPS of $0.21 was below consensus of $0.24, despite a tax benefit. The underperformance this [3Q16] quarter is due to softness in Hep C and the impact of DIR fees."

91.    Defendants knowingly, or recklessly, materially overstated Diplomat's Adjusted EBITDA measures for 1Q16 and 2Q16.  Defendants acknowledge that had they appropriately accrued $1.7 million of DIR fees for 1Q16, Diplomat's normalized Adjusted EBITDA would have been $27.318 million, or about $1.7 million less than

---

[29]    At the close of 1Q16, Defendants gave guidance of $121-$129 million Adjusted EBITDA for fiscal year 2016 ("FY16").  At the close of 2Q16, Defendants confirmed the same guidance for FY16.  However, after Defendants revealed that DIR fees were under-accrued for 1Q16 and 2Q16, Defendants lowered Adjusted EBITDA guidance for FY16 to $107-$111 million.

- 51 -

the $29.019 million Adjusted EBITDA that Defendants falsely reported for 1Q16.[30]

Similarly, Defendants also acknowledge that had they appropriately accrued $2.3 million of DIR fees for 2Q16, Diplomat's normalized Adjusted EBITDA would have been $27.311 million, or about $2.3 million less than the $29.643 million Adjusted EBITDA that Defendants falsely reported for 2Q16.  Consequently, reported Adjusted EBITDA measures for 1Q16 and 2Q16 were materially overstated by 6% and 9%, respectively.[31]

92.     In addition, Defendants also failed to make sufficient disclosures of the nature of the DIR fee accruals, as GAAP required:

> Disclosure of the nature of an accrual made pursuant to the provisions of paragraph 450-20-25-2, and in some circumstances the amount accrued, may be necessary for the financial statements not to be misleading. Terminology used shall be descriptive of the nature of the accrual, such as estimated liability or liability of an estimated amount.[32]

93.     In fact, Defendants failed to mention DIR fees at all, let alone make sufficient disclosures about them to not make them misleading.  There is no mention whatsoever of DIR fees or any synonymous term in the Company's 2015 10-K, or the

---

[30]  Diplomat 3Q16 Earnings Call Supplemental Slides, at 4-5.

[31]  For 1Q16, $1.7 million DIR fees divided by $27.318 million normalized Adjusted EBITDA equals 6%.  For 2Q16, $2.3 million DIR fees divided by $27.311 million normalized Adjusted EBITDA equals 9%.

[32]  ASC-450-20-50-1.

- 52 -

8-Ks and 10-Qs for 1Q16 and 2Q16, despite the fact that Defendants knew, or were reckless in not knowing, that their contracts with Caremark called for accruals of DIR fees in the 3% to 5% range in 2016.

94.    Defendants knowingly, or recklessly, failed to record adequate accruals for DIR fees for 1Q16 and 2Q16, and knowingly failed to make sufficient disclosures about the DIR fees to not make the Company's financial statements false and/or misleading, as required by ASC 450, Contingencies.  Defendants thereby, knowingly, or recklessly, materially overstated GAAP EPS, non-GAAP Adjusted EPS, and non-GAAP Adjusted EBITDA in the Company's income statements in Diplomat's 8-Ks announcing its financial results for 1Q16 and 2Q16, as well as materially overstated GAAP EPS in the 1Q16 and 2Q16 10-Qs.

## B.    Additional Scienter Allegations

95.    As alleged herein, Defendants acted with scienter in that: (1) they knew, or recklessly disregarded, that the public documents and statements issued or disseminated on behalf of Diplomat (or in their own name) were materially false and misleading; (2) they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (3) they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

- 53 -

Defendants, by virtue of their receipt of information reflecting the true facts regarding Diplomat, their control over, and/or receipt and/or modification of Diplomat's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

96.     Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

97.     Because, as alleged *supra* at ¶¶10, 12-15, Caremark specifically notified Defendants before the beginning of the Class Period that starting January 1, 2016, DIR fees would be assessed in an approximate range of 3% to 5%, Defendants, at the very least, had access to information contradicting each of their public statements in Diplomat's 2015 10-K and 10-Qs for 1Q16 and 2Q16.  Defendants thus either knew or recklessly disregarded the fact that the 1,000% to 10,000% increase in DIR fees, compared to the $3 to $7 flat-dollar DIR fees Caremark assessed on each Diplomat prescription prior to 2016, would materially impact the Company's 2016 bottom line.

- 54 -

98.    The fraud alleged herein relates to the core business of Diplomat, and knowledge of the fraud may therefore be imputed to Defendants.  As Diplomat states in its 2016 10-K, over 99% of Diplomat's revenue is derived from its dispensing of specialty drugs.  Additionally, as Hagerman publicly admitted in September 2016, Part D "is a huge part of the specialty pharmacy space."  Thus, Defendants clearly knew of, or were reckless in not knowing of, increases of 1,000% to 10,000% in the amount of fees it would be assessed in 2016 on every Part D prescription it dispensed through Caremark – in comparison to what Diplomat was assessed in prior years – materially impacted the Company's profitability and overall financial success. Indeed, Defendants repeatedly and publicly admitted to both investors and analysts during conference calls and conferences held on and after November 2, 2016, DIR fees had a materially adverse impact on their operations:

- "*DIR fees dramatically impacted our profitability in the quarter*.  $8.5 million in fees were recognized in the third quarter of 2016.  While this only affects revenue in a small way, *it drops 100% to profits*";

- "DIR fees affect revenue first but *given they drop 100% to the bottom line their impact is more acutely felt on our profits*";

- "the DIR fees certainly while they hit revenue they have a far, far greater effect on EBITDA";

- "*[W]hen you have something as dramatic and as impactful as DIR fees which may be one of the most impactful short-term issues I have ever seen in my history at Diplomat, certainly in my 25 years as a CEO*, strategy changes don't take place in a quarter";

- 55 -

- "*We saw a reduction in adjusted EBITDA primarily because of both the DIR fees in the third quarter, and some recalibration of DIR fees* that were [billed out] to us for the first three quarters of the year that didn't hit us in a billing cycle until the third quarter";

- "Overall, 2016 was a challenging year for Diplomat, with the impact of DIR fees";

- "[DIR fees] are not a new phenomenon but last year, one PBM outlier changed their model around a little bit and in the past, *DIR fees have been, again, network asset fees of $3, to $5, to $7. We had an individual outlying PBM that moved their fees in the 3% to 5%, to 5.5%. Now, we're talking about very high cost specialty drugs of $5,000, to $10,000, to $15,000. So that DIR change for that particular outlier is between 1,000% and 10,000% participant higher than the marketplace*"; and

- "[W]e think we're well reserved today. The worst-case scenario is nothing gets better, but we're starting to feel a little better about this. . . . [T]here's not a single PBM that has followed the outliers behavior, right. *And so if you've got a whole industry that's at $3 to $5 DIR fees, which we don't love, but on a $10,000 drug we aren't going to argue and fight about, and all of a sudden, one player goes to 3% to 5%. When you think about that [], that's a 1000% to 10,000% price increase. And by the way, that's a 10,000% price increase for doing nothing* different, right. There is no service being offered, there's nothing being added."

99.    In fact, DIR fees were so important to Diplomat's core business operations that, starting with its 3Q16 10-Q, Defendants not only finally acknowledged the existence of DIR fees, but actually changed Diplomat's revenue recognition policy to state:

> The Company accrues an estimate of fees, including direct and indirect remuneration ("DIR") fees, which are assessed or expected to be assessed by payors at some point after adjudication of a claim.

- 56 -

100.    Moreover, the Individual Defendants possessed substantial motives for concealing both the existence and material financial impact of DIR fees on Diplomat's bottom line throughout the Class Period.  Between late 2015 and early 2016, Diplomat and CVS began serious negotiations for CVS to acquire the Company.   These negotiations between Diplomat and CVS continued through the fall of 2016.

101.    Defendants were incentivized to keep news of Caremark's dramatic DIR fee change hidden from investors, and hence, Diplomat's stock price artificially inflated throughout the Class Period, via: (1) materially misleading statements and omissions in Diplomat's 2015 10-K and 10-Qs for 1Q16 and 2Q16; and (2) materially false and misleading quarterly financial statements filed with the SEC that publicly misrepresented Diplomat as a more profitable and financially successful company than it actually was.

102.    First, had CVS made an all-cash acquisition of Diplomat during the Class Period, then the Individual Defendants would receive lucrative payouts.  For example, if CVS had purchased Hagerman and his family's holdings of over 38 million shares of Diplomat common stock[33] for $32.97 per share (the closing price of Diplomat's stock on June 1, 2016), then the Diplomat CEO and his family would have reaped

---

[33]  *See* SEC Form 13G/A filed by Diplomat with the SEC on February 16, 2016.

approximately $1.25 billion in gross profits.  Similarly, if CVS had purchased Whelan's nearly 271,000 shares[34] for the same per-share amount ($32.97), then Diplomat's former CFO would have received approximately $89.3 million in gross profits.  Moreover, the fact that neither Hagerman (who sold approximately $178 million worth of stock between the Company's IPO in October 2014 and December 2015) nor Whelan (who sold approximately $5.7 million worth of shares in August 2015) sold any shares during the Class Period, bolsters the inference that Diplomat's CEO and CFO were holding onto as many shares as possible in the hopes of a CVS acquisition that could net them tens of millions (and for Hagerman, potentially over $1.25 billion) in profits.[35]

103.   Second, according to the 2015 Proxy, depending on whether Diplomat met or exceeded certain Adjusted EBITDA and revenue targets for 2016: (1) Hagerman would receive an award of performance-based stock options; and (2) Whelan would be awarded incentive compensation in the form of both stock options and a cash bonus.  As explained in more detail above, by failing to properly accrue and account for the significant increase in Caremark-assessed DIR fees and reflect

---

[34]   According to Diplomat's 2015 Proxy.

[35]   It should also be noted that during the Class Period, the Company's President, Gary Kadlec ("Kadlec"), did not sell any Diplomat shares either.

such accruals in Diplomat's 1Q16 and 2Q16 financial statements filed with the SEC during the Class Period, Defendants materially overstated the Company's Adjusted EBITDA.  Additionally, as the Individual Defendants would later publicly (and for the first time) reveal to investors and analysts when discussing the Company's 3Q16 financial results, "the DIR fees certainly while they hit revenue, *they have a far, far greater effect on EBITDA*."  As a result of Defendant's knowing failure to properly and timely accrue additional DIR fees of $1.7 million in 1Q16 and $2.3 million in 2Q16, Defendants' reported Adjusted EBITDA measures for 1Q16 and 2Q16 were materially overstated by 6% and 9%, respectively.

104.   Taken collectively, the facts alleged herein, support a strong inference of Defendants' scienter.

## V.    LOSS CAUSATION/ECONOMIC LOSS

105.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Diplomat common stock and operated as a fraud or deceit on Class Period purchasers of Diplomat common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market via their October 25, 2016 partial disclosure of the truth and their November 2, 2016 full disclosure of the previously concealed truth, the price of Diplomat common stock fell

- 59 -

precipitously as the prior artificial inflation came out. As a result of their purchases of Diplomat common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

### A. CFO Whelan's Abrupt Resignation Partially Revealed that Diplomat Was Suffering Disappointing 3Q16 Financial Results from Dramatically Increased DIR Fees

106. In a press release issued after the close of trading on October 25, 2016, Diplomat made the startling announcement that Whelan, the Company's CFO for the past six years, had resigned. With no successor in place, Diplomat further announced that Robin Johnson, the Company's Vice President of Finance and CFO of Diplomat's Specialty Infusion Division, would step in "until a formal replacement has been appointed."

107. While Diplomat publicly said that the 45-year old CFO was resigning to spend more time with his family, it was certainly suspicious that the Company who just six months earlier in its 2015 Proxy stated "[w]e do not provide severance benefits to any of our named executive officers," gave Whelan $250,000 as part of a severance agreement that contained a year-long non-compete clause.

108. Trying to blunt the shock of Whelan's resignation, Diplomat also announced that Kadlec, the Company's President, would be retiring after working nearly 45 years in the health care industry, the last 4 of which were with Diplomat.

- 60 -

109.   Although not disclosing the significant increase in DIR fees, this news partially disclosed the previously concealed truth regarding Diplomat's deteriorating 3Q16 results.

110.   On October 26, 2016, Diplomat's stock tumbled from $28.88 to $25.31 – a decline of more than 12%, on unusually high volume.

111.   Following this news, financial analysts covering Diplomat noted that Whelan's departure indicated that there was undisclosed news reflecting the Company's deteriorating performance.  According to AvondalePartners, "[t]he biggest concern, in our view, is that mgmt. did not comment on CY16 guidance in tandem with this significant announcement."  Numerous other analysts echoed this concern in their reports, for example:

(a)   Leerink called Whelan's resignation

[s]udden and surprising, and we are incrementally more cautious on 3Q:16 results. . . .  The timing of Sean's departure seems very unusual to us . . . .  *In our view it is very unusual to announce the departure of a CFO one week ahead of reporting earnings.  Given the timing of this press report, and our concerns about last quarter's results as well as specialty volumes, we are more cautious on 3Q:16 earnings*.

(b)   Mizuho Securities stated that the "abrupt executive shakeup just a week before the company releases third-quarter earnings is 'worrisome.'"

(c)    Analysts for Credit Suisse wrote that between Kadlec's retirement and Whelan's resignation, "*we view Whelan's departure as more of a concern, with no full time replacement named and 3Q16 earnings yet to be reported*" and that Whelan's resignation bolstered their thesis that Diplomat's "*torrid growth is not remotely sustainable*."

### B.    Defendants Finally Reveal the Entirety of the Previously Concealed Truth that Its 3Q16 Results Were Negatively Impacted by Dramatically Increased DIR Fees

112.    In a press release issued after the close of trading on November 2, 2016, Diplomat announced its 3Q16 financial results, reporting that "[t]hird quarter revenue and profit measures, compared to the year ago period, were negatively impacted by an incremental $8 million of DIR fees, of which $4 million was retroactive to Q1 and Q2 2016."  The press release quoted CEO Hagerman, who stated:

> "*We are disappointed with our third quarter results, which were significantly impacted by the softness in the hepatitis C business nationwide, as well as by DIR fees.  The methodology and transparency around how PBMs are applying these DIR fees changed materially in 2016*, and while we cannot reverse the impact they had on this quarter, we are working with our partners in the specialty pharmacy industry and with legislators to achieve an amicable solution to this problem."

113.    As the Individual Defendants told investors and analysts during a conference call that same day:

(a)    "***DIR fees dramatically impacted our profitability in the quarter***" and that the "fees affected revenue first but given they drop 100% to the bottom line, their impact is more acutely felt on our profits";

(b)    "***[W]hen you have something as dramatic and as impactful as DIR fees which may be one of the most impactful short-term issues I have ever seen in my history at Diplomat***", certainly in my 25 years as a CEO, strategy changes don't take place in a quarter"; and

(c)    "***DIR fees dramatically impacted our profitability in the quarter***. $8.5 million in fees were recognized in the third quarter of 2016.  While this only affects revenue in a small way, it drops 100% to profits."

114.   Diplomat's CEO and lame-duck CFO also repeatedly emphasized that these DIR fees were some unforeseeable event, catching "the specialty pharmacy industry by surprise during the third quarter."  Even though Caremark specifically notified Diplomat and other preferred network retail and specialty pharmacies about these DIR fee changes prior to the start of the Class Period in February 2016, the Individual Defendants nonetheless labeled these fees as some sort of phenomenon whose "potential magnitude" was unknowable to all specialty pharmacies until they received their "first 2016 fee statements this quarter."

115.   In response to Defendants' after-hours disclosure about the material financial impact DIR fees had on Diplomat's 3Q16 results, the Company's stock plummeted more than 40% on November 3, 2016, from $22.38 to $12.95, on the heaviest volume of trading the Company's stock has ever had.

116.   As the numerous analyst reports issued following this announcement demonstrate, Defendants' announcement about DIR fees was one of the main driving causes behind the more than 40% plunge in Diplomat's stock price.  For example, between November 2 and 4, 2016:

**Credit Suisse analysts wrote**:

   "*The gross margin continued its downward spiral, falling 135 bps y/y, with DPLO citing DIR fees as a larger price concession*."

                              *       *       *

   "More tangible evidence that growth is slowing and new profit challenges are emerging spell trouble for DPLO, which doesn't happen to be generating much cash.  Our thesis remains that deals will be increasingly necessary to offset slowing organic trends, with no logical buyer of the company waiting in the wings.  *DIR fees as an issue further obfuscates the pathway to sustainable economic profit generation*."

**Wells Fargo analysts wrote**:

   "The biggest drivers of the core EPS shortfall were new 'direct and indirect remuneration' (DIR) fees."

- 64 -

**JP Morgan analysts wrote**:

"Yesterday evening, DPLO reported 3Q16 adjusted EPS $0.03 below Bloomberg consensus and adjusted EBITDA ~$10M below consensus. ***The company cited DIR fees (a portion of which were retroactive) and the deceleration in the hep C market as the main drivers***."

**Barclays analysts wrote that**:

DIR fees "impact DPLO's revenues and are a 100% flow-through to the gross profit line, ***significantly impacting DPLO's EBITDA***."

**Cowen and Company analysts wrote**:

"DPLO reported results below consensus due to softness in Hep C and incremental DIR fees."

**Leerink analysts wrote**:

"***The main driver of the miss in the quarter was the ~$8.5M in DIR fees***, and a significant decline in Hepatitis C revenue. DIR fees are fees that the PBMs charge retail and specialty pharmacies for network access, credentialing, and other services. DPLO indicated that late in 3Q:16 they were notified by their PBMs that DIR fees related to 1H:16 have increased substantially and as a result DPLO incurred an $8.5M reduction in revenue in 3Q:16 which flows directly through to EBITDA."

117.    Analysts were deeply skeptical at Defendants' explanation of the sudden

DIR fee announcement as some unforeseen industry-wide event. For example:

**AvondalePartners analysts wrote**:

"Although we had speculated in research published upon the announcement of DPLO CFO retirement that DPLO would likely lower guidance, we did not expect such an anemic outlook for CY17 revenue

- 65 -

guidance.  ***The company is being impacted by expanded Direct and Indirect Remuneration fees (DIR) paid to the PBMs, which was certainly a surprise to us***."

**Barclays analysts wrote**:

"With Q3 results, ***Diplomat disclosed a material new headwind in the form of Direct and Indirect Remuneration (DIR) fees*** associated with serving Medicare Part D Plans (PDPs) – which we estimate accounts for ~35% of total revenue, above the industry average."

**Morgan Stanley analysts wrote**:

"***The new headwind introduced this quarter was an increase in PBM Direct and Indirect Remuneration or DIR fees*** which surprised Diplomat management and are estimated to translate to a ~13% cut to 2016 EBITDA ($15-16 million) and a ~19 cut to 2017 EBITDA ($20-30 million)."

**William Blair analysts wrote**:

"***On Wednesday evening, November 2, Diplomat reported third-quarter earnings that were well below our expectations***.  The company also reduced guidance for the remainder of 2016 by $0.07 and gave early comments on 2017 that suggest roughly flat earnings.  ***The culprits for the disappointing reset appear to be higher (and reportedly arbitrary) fees now being assessed by PBMs***, larger declines in hepatitis C revenues, and a smaller contribution from brand drug inflation."

\*       \*       \*

"***We are surprised by the magnitude and speed of the deterioration in the company's business***.  While there appear to be at least three noted causes, as highlighted by management, ***we view this sobering miss*** as perhaps the first sign that payers and PBMs are flexing their muscle against specialty pharmacies such as Diplomat as they try to better control specialty spending through narrow networks and other tools."

- 66 -

**Leerink analysts wrote**:

*The sudden appearance of DIR fees for DPLO was most likely company specific and may have been a communication issue between the accounting department and the 'network management department*. Our specialists stated DIR fees have been around since 2006 and are a known expense that should have been properly accrued for.

\*        \*        \*

Our checks indicate that it is possible that the pharmacies had a "free ride" for a few years while CVS focused on eligibility and formularies. Though DIR fees are nothing new, our specialists indicated that in the last few years, CMS has been pressing to include "every fee possible" in the Prescription Drug Event (PDE) (the claim that is submitted to them). *Although DPLO was claiming they should be exempt, in our view the audits are justified if they are contracting with Part D plan sponsors*. Our checks indicate that it could have been an issue with the "performance based application of these metrics," however *the pharmacy should be aware of the contractual obligations that have to be paid back to the PBMs*, and passed through to the health plan.

**Credit Suisse analysts wrote**:

*Whether or not the DIR fees are a legitimate industry concern or simply a rather monumental operating gaffe by DPLO*, which is a distinct possibility absent similar lamentations from other companies in our universe, DPLO now expects to incur a $20 to $30 million hit from DIR fees in 2017, eliminating any meaningful operating profit growth in 2017.

118.    And Dr. Adam Fein authored a post on his well-respected pharmaceutical

industry focused blog, *Drug Channels*, entitled "Behind Diplomat Pharmacy's Plunge:

A Primer on DIR Fees in Medicare Part D," writing on November 8, 2016:

- 67 -

Are pharmacies flying blind? I'm not sure. There are technology tools that purportedly allow pharmacy owners to view DIR fee computations and estimate their financial impact. A pharmacy could therefore accrue for these liabilities.

119. The public statements coming from other companies in the specialty pharmacy industry in November 2016 severely contradicted Defendants' constant attempts to justify their previous false and/or misleading statements and omissions about DIR fees as a result of some industry-wide ignorance. Premier called DIR fees "immaterial" to their 3Q16 financial results, and PharMerica told investors on November 9, 2016:

> We certainly have had exposure to DIR in our specialty business with Onco. ***And we have adequately reserved for the DIR fees. We update those on a monthly basis, quarterly basis***. And I wouldn't say that there hasn't been some pressure on earnings because of DIR fees; ***but I will also tell you that we are on top of it, and we have been on top of it since day one***. So, we have it under control.

120. Indeed, CVS (Caremark's parent company) told investors and analysts in early 2017 that not only did Caremark alert Diplomat of this drastic change in DIR fee assessment prior to the beginning of 2016, but that throughout 1Q16 and 2Q16, "[Diplomat] did not accrue properly for that they had to remit." As the President and CEO of the PCMA said in February 2017, the reason pharmacies like Diplomat "attack" DIR fees is that "they sign a contract to pay for it, and then they don't want to hold up their end of the bargain."

- 68 -

121.   As a result of their purchases of Diplomat common stock during the Class Period, Plaintiffs and the other class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements and omissions had the intended effect and caused Diplomat common stock to trade at artificially inflated levels throughout the Class Period.

122.   By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Diplomat's business and prospects. When the truth about the Company was revealed to the market after the close of trading on October 25, 2016 and November 2, 2016, the price of Diplomat common stock fell precipitously.

123.   These declines removed the inflation from the price of Diplomat common stock, causing real economic loss to investors who had purchased Diplomat common stock during the Class Period.  The declines in the price of Diplomat common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Diplomat common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The

- 69 -

economic loss, *i.e.*, damages, suffered by Plaintiffs and the other class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Diplomat common stock and the subsequent significant decline in the value of Diplomat common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

124.    Plaintiffs and the class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

125.    Plaintiffs and the class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Diplomat common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Diplomat common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    Diplomat common stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

- 70 -

(c)    As a regulated issuer, Diplomat filed periodic public reports with the SEC and the NYSE;

(d)    Diplomat regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)    Diplomat was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

126.  As a result of the foregoing, the market for Diplomat common stock promptly incorporated current information regarding Diplomat from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in Diplomat common stock during the Class Period suffered similar injury through their transactions in Diplomat common stock at artificially inflated prices and a presumption of reliance applies.

## VII.  NO SAFE HARBOR

The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Diplomat who knew that those statements were false when made.

## VIII.  CLASS ACTION ALLEGATIONS

127.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who transacted in Diplomat common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the

- 72 -

Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

128.   The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Diplomat common stock was actively traded on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Diplomat or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.   While the exact number of Class members is unknown to Plaintiffs, Diplomat reported more than 66 million shares of common stock outstanding as of November 1, 2016.  Accordingly, Plaintiffs reasonably believe that there are thousands of members in the proposed Class.

129.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

130.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

- 73 -

131.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants' acts as alleged herein violated the federal securities laws;

(b)    Whether Defendants' statements made to the investing public misrepresented or omitted material facts about Diplomat's business, operations and financial conditions;

(c)    Whether the price of Diplomat common stock was artificially inflated during the Class Period; and

(d)    To what extent the Class members have sustained damages and the proper measure of damages.

132.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 74 -

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

133. Plaintiffs repeat and reallege each and every allegation contained above.

134. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Diplomat common stock during the Class Period.

136. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Diplomat common

- 75 -

stock. Plaintiffs and the Class would not have purchased Diplomat common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

137.    Plaintiffs repeat and reallege each and every allegation contained above.

(a)    By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading;

(b)    The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

- 76 -

(c)    Because of their positions as CEO and CFO, the Individual Defendants directly participated in the Company's management and were directly involved in Diplomat's day-to-day operations.  The Individual Defendants also controlled the contents of Diplomat's quarterly reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

138.   By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring that Defendants are liable pursuant to the Exchange Act;

B.    Determining and certifying that this action is a proper class action and certifying Plaintiffs as  Class representatives and Plaintiffs' counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- 77 -

1248219_1

C.     Awarding compensatory damages in favor of Plaintiffs and the Class against Defendants, jointly and severally, for damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

D.     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E.     Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  April 11, 2017                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                          JONAH H. GOLDSTEIN
                                          MATTHEW I. ALPERT


                                               s/ MATTHEW I. ALPERT
                                          _____
                                               MATTHEW I. ALPERT

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

- 78 -

GLANCY PRONGAY & MURRAY LLP
LIONEL Z. GLANCY
ROBERT V. PRONGAY
LESLEY F. PORTNOY
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)

Counsel for Lead Plaintiffs and the Class

VANOVERBEKE MICHAUD &
   TIMMONY, P.C.
MICHAEL J. VANOVERBEKE (P42641)
THOMAS C. MICHAUD (P46787)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

THE MILLER LAW FIRM, P.C.
E. POWELL MILLER (P39487)
SHARON S. ALMONRODE (P33938)
950 W. University Dr., Suite 300
Rochester, MI  48307
Telephone:  248/841-2200
248/652-2852 (fax)
mln@millerlawpc.com
ssa@millerlawpc.com

Liaison Counsel for the Class

- 79 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 11, 2017.

<u>s/ MATTHEW I. ALPERT</u>
MATTHEW I. ALPERT

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  malpert@rgrdlaw.com

- 80 -

1248219_1

# Mailing Information for a Case 5:16-cv-14005-JCO-SDD Zimmerman v. Diplomat Pharmacy, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sharon S. Almonrode**
  ssa@millerlawpc.com,djv@ecf.courtdrive.com,djv@millerlawpc.com,ssa@ecf.courtdrive.com,ajm@millerlawpc.com,ajm@ecf.courtdrive.com

- **Matthew I. Alpert**
  malpert@rgrdlaw.com,kathyj@rgrdlaw.com,nwise@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James W. Ducayet**
  jducayet@sidley.com,james-ducayet-9115@ecf.pacerpro.com,efilingnotice@sidley.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Nicholas B Gorga**
  ngorga@honigman.com,litdocket@honigman.com,mjohnson@honigman.com

- **Thomas C. Michaud**
  tmichaud@vmtlaw.com

- **E. Powell Miller**
  epm@millerlawpc.com,djv@ecf.courtdrive.com,asl@ecf.courtdrive.com,aad@ecf.courtdrive.com,aad@millerlawpc.com,asl@millerlawpc.com

- **Andrew M. Pauwels**
  apauwels@honigman.com,litdocket@honigman.com,ahatcher@honigman.com

- **Nilofer I. Umar**
  numar@sidley.com,efilingnotice@sidley.com,nilofer-umar-6698@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)